AMERICAN NATIONAL INSURANCE COMPANY, PETITIONER-PLAINTIFF v. JOHN RANDOLPH INGRAM, COMMISSIONER OF INSURANCE, STATE OF NORTH CAROLINA, RESPONDENT-DEFENDANT

No. 8210SC232

(Filed 5 July 1983)

**Insurance § 1— insurance regulation—Commissioner not exceeding statutory authority**

The Insurance Commissioner did not exceed his statutory authority by promulgating a rule in conjunction with G.S. 58-251.2 that required optionally renewable hospitalization and accident and health insurance policies to be terminated before a rate increase could be granted to a company. The regulation required termination of a policy under the old rate with an option given to the policy holder to replace his policy with the same coverage at the approved increased rate. The regulation as applied by the Insurance Commissioner is consistent with the legislative intent of G.S. 58-251.2. The required termination of

insurance policies as a prerequisite to seeking a rate increase does not constitute a violation of equal protection and due process clauses nor rights pursuant to 42 U.S.C. § 1983.

APPEAL by petitioner from *Bailey, Judge.* Judgment and order entered 3 December 1981 in Superior Court, WAKE County. Heard in the Court of Appeals 14 January 1983.

*Attorney General Edmisten, by Special Deputy Attorney General Isham B. Hudson, Jr., for the State.*

*Allen, Steed & Allen, by Charles D. Case and R. Bradley Miller, for petitioner appellant.*

BECTON, Judge.

This appeal concerns the Insurance Commissioner's statutory authority to issue regulation 11 N.C.A.C. 12.0502 and the constitutionality of this regulation, which, in relevant part, provides:

> With respect to G.S. 58-251.2, entitled Renewability of Individual and Blanket Hospitalization and Accident and Health Insurance Policies, the provisions therein relative to rate increases on such policies is [sic] interpreted by the department to mean that notice of nonrenewal must be given and a public hearing held before the commissioner renders a decision thereon. If a rate increase is approved it may be applied to the period for which notice of nonrenewal has been given, at the end of which the policy will terminate.

## I

By letter dated 19 May 1980, petitioner, American National Insurance Company (American) requested a rate increase for three hospitalization and accident and health policies. American sought a 20% premium rate increase effective 1 August 1980 because of alleged loss experience ratios on the three policies and anticipated loss ratios. On 9 June 1980, a letter was sent from the Insurance Commissioner's office to American indicating that, since the policies were renewable at the option of American, the company must comply with N.C. Gen. Stat. § 58-251.2 (1982) which, in relevant part, reads:

> The insurer upon a showing of inadequacy of the rates chargeable on such policies upon which notice of nonrenewal

has been given, and a finding as to the same by the Commissioner of Insurance, may increase such rates with the approval of the Commissioner. Thereafter, such rates shall be applicable to all policies of the same type, the holders of which receive notice of nonrenewal. The policyholder thereafter must pay the increased rate in order to continue the policy in force. The requirements of this provision shall not apply to refusal of renewal because of change of occupation of the insured to one classified by the company as uninsurable nor to increase in rate due to change of occupation of the insured to a more hazardous occupation.

The 9 June 1980 letter stated:

Under this statute, the company must give notice of nonrenewal before applying for a rate increase. After this has been done and a request made to the Department for the increase, a public hearing must be held, after which the Commissioner will rule on your request. If the increase is approved, it may be applied to the period for which notice of nonrenewal has been given at the end of which time the policy must terminate.

Dissatisfied with the interpretation given to G.S. § 58-251.2 by the Insurance Commissioner's office, American filed this action in Wake County Superior Court and, at the same time, filed with the Insurance Commissioner a request for an administrative hearing and a petition for a declaratory ruling pursuant to the North Carolina Administrative Procedure Act (NCAPA), N.C. Gen. Stat. §§ 150A-1 (1983) *et seq.* Subsequently, on 3 November 1980, American filed with the Insurance Commissioner a petition for amendment or repeal of 11 N.C.A.C. 12.0502.

On 20 January 1981, an administrative hearing was conducted before Deputy Commissioner E. D. Nelson. As of November 1981, no order had been entered pursuant to this hearing, nor had the Insurance Commissioner's office responded to American's petition for amendment or repeal of regulation 11 N.C.A.C. 12.0502. American therefore filed amended pleadings in the Wake County Superior Court which included: (i) a petition for a determination that the Insurance Commissioner's refusal to approve a rate increase on American's policies until notice of nonrenewal had been given, was erroneous; (ii) a request for a

declaratory ruling that G.S. § 58-251.2 and 11 N.C.A.C. 12.0502 are unconstitutional and void; (iii) a request for injunctive relief; and (iv) redress for alleged deprivation of civil rights pursuant to 42 U.S.C. § 1983.

At a 30 November 1981 hearing before Superior Court Judge James H. Pou Bailey concerning American's motion for preliminary injunction, counsel for the Insurance Commissioner and for American stipulated that American had exhausted its administrative remedies; that the Insurance Commissioner's failure to issue a declaratory ruling constituted a denial of American's request; and that the Insurance Commissioner's decision was reviewable on the merits under the provisions of the NCAPA. *See* N.C. Gen. Stat. § 150A-17 (1983) and Article IV of the North Carolina Administrative Procedure Act. After hearing arguments from both sides, the Wake County Superior Court entered an order on 3 December 1981 denying the relief sought by American and, thereby, affirming the Commissioner's denial of American's rate increase request. The Superior Court specifically held that the policies in question were properly subject to the challenged regulation and that the regulation itself was valid and enforceable. It is from this order that American appeals. (Interestingly, after the Superior Court issued its 3 December 1981 order, the Commissioner issued an order which, although dated 30 November 1981, also explicitly denied American's rate increase request and upheld the validity of 11 N.C.A.C. 12.0502.)

II

A. Scope of Review

When an appellate court is reviewing the decision of another court—as opposed to the decision of an administrative agency—the scope of review to be applied by the appellate court under G.S. § 150A-52 is the same as it is for other civil cases. That is, we must determine whether the trial court committed any errors of law. *See* N.C. Gen. Stat. § 7A-27(b) (1981) and Rule 10(a) of the North Carolina Rules of Appellate Procedure. The errors of law alleged herein are based on the failure of the trial court properly to apply the judicial review standards of G.S. § 150A-51.

In examining the Insurance Commissioner's decision, the trial court was governed by the scope of review set out in G.S. § 150A-51:

> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire records submitted; or
>
> (6) Arbitrary or capricious.

American first argues that the Insurance Commissioner contravened subsections (2), (4), and (6) of this statute when he promulgated regulation 11 N.C.A.C. 12.0502 and applied that regulation to American's rate increase request. For the reasons that follow, we disagree.

B. Excess of Statutory Authority

American argues that the Insurance Commissioner exceeded his statutory authority by promulgating a rule which achieves a result not required or authorized by G.S. § 58-251.2: "the requirement that optionally renewable policies be terminated before a rate increase can be granted." American further contends that the paragraph in this statute regarding rate increases applies only to situations in which a company wishes to terminate a set of policies and not when the company is merely seeking a rate increase.

In deciding whether the Insurance Commissioner exceeded his statutory authority, we must first examine G.S. § 58-9(1). This

statute bestows upon the Insurance Commissioner the powers and duties to:

> [s]ee that all laws of this State governing insurance companies, associations, orders or bureaus relating to the business of insurance are faithfully executed, and to that end he shall have power and authority to make rules and regulations, not inconsistent with law, to enforce, carry out and make effective the provisions of this Chapter, and to make such further rules and regulations not contrary to any provision of this Chapter which will prevent practices injurious to the public by insurance companies . . . .

In accordance with this statute, regulation 11 N.C.A.C. 12.0502 sets out the required procedures for enforcement of that portion of G.S. § 58-251.2 concerning rate increase requests. Indeed, even though the regulation tracks the wording and plain meaning of G.S. § 58-251.2, American, nevertheless, argues that the provision of the regulation requesting notice of nonrenewal and termination of the policy is injurious to the public and, therefore, in conflict with the statute.

At the hearing before the Deputy Commissioner, American's vice-president emphasized that the requirement of nonrenewal and termination "eliminates necessary medical coverage for a group of policyholders, many of whom may be at advanced ages, making it difficult for them to acquire suitable coverage elsewhere, particularly if any of such insureds have existing medical conditions." Regulation 11 N.C.A.C. 12.0502 does require notice of nonrenewal followed by mandatory termination of the policy when a rate increase is approved. However, this regulation is not injurious to the public when it is viewed in conjunction with (a) the wording of G.S. § 58-251.2, (b) the Insurance Commissioner's prior application of the regulation, and (c) the legislative intent underlying this statute. Simply put, the regulation requires termination of a policy under the old rate with an option given to the policyholder to replace this policy with the same coverage at the approved increased rate. It is the policy *under the old rate* that is nonrenewed and terminated.

G.S. § 58-251.2 expressly provides that notice of nonrenewal must be given when seeking a rate increase request. The only situations expressly excused from this requirement are refusal of

renewal because of an insured's change of occupation to one classified uninsurable and an increase in rate due to the insured taking on a more hazardous occupation. American's request for a rate increase because of losses is not one excused from the required notice of nonrenewal.

G.S. § 58-251.2 further provides that once notice of nonrenewal is given, "[t]he policyholder thereafter must pay the increased rate in order to continue the policy in force." This language clearly protects the policyholder from the injury envisioned by American: the automatic elimination of necessary medical coverage for a group of policyholders who may be of advanced ages and who may have existing medical conditions.

Further, the Record on Appeal in the case *sub judice* contains a November 1981 order allowing a rate increase to another insurance company — Metropolitan Life — which reveals that the regulation, *as applied,* is not inconsistent with the statutory language giving the policyholder an option to pay the increased rate and continue coverage. In that case [Docket No. D-233] the Deputy Commissioner found "[t]hat all North Carolina policyholders are being given an opportunity to replace the present insurance coverage being nonrenewed with coverage that is comparable without proof of insurability or may exercise the conversion privilege in the present insurance policy." The Deputy Commissioner then ordered:

> That the filings by the insurance company for revisions in premium rates for employee benefit plan policy forms 91AH-61 and 91B-61 with rider forms used in connection therewith are hereby approved effective prospectively, provided, however, that no rate increase shall take effect until 30 days after the insurance company has advised all policyholders of this rate increase and has given all policyholders the following alternatives: (1) the opportunity to replace present coverage, without any requirements as to proof of insurability, waiting or contestibility [sic] periods and preexisting conditions; or (2) the opportunity to exercise the conversion privilege in present insured policies.

We point out finally that regulation 11 N.C.A.C. 12.0502 as applied by the Insurance Commission appears to be consistent with the legislative intent of G.S. § 58-251.2. Although the at-

torneys for the parties have affixed different labels to the prac-
tice G.S. § 58-251.2 was designed to alleviate,[1] the Attorney
General, in a 1969 opinion, gave the following rationale for the
statute which, while not necessarily inconsistent with the posi-
tions taken by the parties, is compelling.

> The Act was designed to curb the abuse, at that time, of A &
> H companies collecting premiums, then mass cancelling of
> policies. In order to prevent companies from being locked in
> on inadequate rates, however, the General Assembly provid-
> ed a method whereby the company, after giving the proper
> notice of non-renewal, could seek a rate increase.

40 Op. Att'y. Gen. 340, 341 (1969). The statute, as interpreted by
the regulation, allows the company to recoup some of its losses
through a rate increase and gives the policyholders sufficient
time to seek alternative coverage, if they so desire, before the
policy terminates.

Based on the foregoing, we discern no purpose in the
statutory requirement that notice of nonrenewal be given if, in
fact, termination of coverage at the old rate was not intended by
the Legislature. Consequently, the Insurance Commissioner did
not exceed his authority by promulgating Regulation 11 N.C.A.C.
12.0502.

---

1. American's counsel argues that G.S. § 58-251.2 was designed "to stop the
previously existing condition of 'skimming', or 'collecting premiums, then mass
cancelling of policies.'"

The Insurance Commissioner's counsel argues that the statute was "directed at
a practice more properly denominated 'claims underwriting' rather than
'skimming'" and describes claims underwriting as follows:

> An insurer that practices 'claims underwriting' will not incur a lot of ex-
> pense in the investigation of applicants for insurance or require prior medical
> exams. It merely waits until a claim is filed and a medical report (which often
> includes a medical history) is furnished along with the proof of loss. At this
> point, the insurer makes the underwriting decision whether to continue
> coverage. Since many claims in the early years of the policy can be denied
> under the 'pre-existing condition' exclusion, 'claims underwriting' is an
> economical way (from the standpoint of the insurer) to do business. Too, 'no
> medical exam required' may be an effective, if somewhat misleading, sales
> pitch.

## C. Arbitrary or Capricious

American next contends that the refusal of the Insurance Commissioner to grant or even review its rate increase request was arbitrary and capricious.

> Agency decisions have been found arbitrary and capricious, *inter alia*, when such decisions are 'whimsical' because they indicate a lack of fair and careful consideration; when they fail to indicate 'any course of reasoning and the exercise of judgment,' (citation omitted), or when they impose or omit procedural requirements that result in manifest unfairness in the circumstances though within the letter of statutory requirements. . . . (Citation omitted.)

*Comr. of Insurance v. Rate Bureau*, 300 N.C. 381, 420, 269 S.E. 2d 547, 573, *pet. for reh. denied*, 301 N.C. 107, 273 S.E. 2d 300 (1980). The decision of the Insurance Commissioner to deny American's request for a rate increase was not arbitrary or capricious. This decision merely followed the regulation which requires notice of nonrenewal and a public hearing before review of a rate increase request. In addition, these requirements are neither unreasonable nor unfair to the company or its policyholders. By requiring notice of nonrenewal when seeking a rate increase, the regulation gives the policyholder (a) the option to pay the increased rate and continue his coverage with the company, or (b) time to find other insurance. This regulation protects the company by allowing it to recoup some of the losses incurred under the old premium rate.

## D. Violations of Due Process of Law and Equal Protection

American's contention that the required termination of its policies as a prerequisite to seeking a rate increase constitutes violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment is groundless, in light of our interpretation of this regulation and its prior application. Moreover, State economic regulatory classifications such as this involve no suspect classification or fundamental freedom and receive only "reasonable scrutiny." *See Hughes v. Alexandria Scrap Corporation*, 426 U.S. 794, 49 L.Ed. 2d 220, 96 S.Ct. 2488 (1976).

> Legislation subject only to reasonable scrutiny, even though it may cause some disparate treatment among similarly

situated businesses, will not be held violative of the Equal Protection or Due Process Clauses of the Fourteenth Amendment if it bears a 'rational relationship to a permissible state objective.' [Citations omitted.] Such legislation need not be the best resolution of a particular problem. It can, in fact, be seriously flawed and result in substantial inequality and still remain constitutional if it has some reasonable basis. [Citations omitted.] It will not be set aside if "any state of facts reasonable may be conceived to justify it." [Citation omitted.]

*Prudential Property and Casualty Co. v. Ins. Commission, et al.,* 534 F. Supp. 571, 576 (C.D.S.C. 1982), *aff'd,* 699 F. 2d 690 (4th Cir. 1983). Under this test of "reasonable scrutiny," the regulation at issue is deemed constitutional.

E. Claim Under 42 U.S.C. § 1983

American has alleged violations of its rights pursuant to 42 U.S.C.A. § 1983 (West 1981). Recovery under this Act is predicated upon a finding of deprivation of rights, privileges or immunities secured by the Constitution. Since no such violation has been shown, we find this argument unpersuasive.

F. Evidentiary Error

The final argument involves evidentiary matters. American argues that the Deputy Commissioner refused to consider reliable evidence. The record shows that this evidence was eventually admitted at the hearing. American also excepts to the admission of alleged irrelevant testimony. This same testimony was earlier admitted without objection. For these reasons, American was not prejudiced.

The judgment and order appealed from is

Affirmed.

Judges WEBB and PHILLIPS concur.